**Monroe W. SCOTT, Jr., Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 85–206, 86–423.

District of Columbia Court of Appeals.

Argued Oct. 3, 1988.
Decided May 10, 1989.

James Klein, Public Defender Service, with whom Maureen T. Cannon and Jennifer P. Lyman, Public Defender Service, Washington, D.C., were on the brief, for appellant.

Saul M. Pilchen, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., at the time the brief was filed, and Michael W. Farrell and Zinora M. Mitchell, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

ON REHEARING EN BANC

Before ROGERS,* Chief Judge, MACK, NEWMAN, FERREN, TERRY, STEADMAN, and SCHWELB, Associate Judges, and PRYOR, Senior Judge.**

ROGERS, Chief Judge:

We must decide the appropriate remedy for a violation of Canon 3(C)(1) of the American Bar Association's Code of Judicial Conduct which requires that "[a] judge

---

* JUDITH W. ROGERS was an *Associate Judge* at the time of argument. Her status changed to *Chief Judge* on November 1, 1988.

** WILLIAM C. PRYOR was *Chief Judge* at the time of argument. His status changed to *Senior Judge* on November 2, 1988.

should disqualify himself in a proceeding in which his impartiality might reasonably be questioned." CODE OF JUDICIAL CONDUCT Canon 3(C)(1).[1] The trial judge presided at a trial prosecuted by the United States Attorney for the District of Columbia, a division of the United States Department of Justice, while the judge was negotiating for employment with the Executive Office for United States Attorneys in the Department of Justice. The defendant, appellant Monroe W. Scott, Jr., learned of the judge's negotiations after he had been sentenced and he had noted an appeal from his conviction. Applying the special harmless error test of *Liljeberg v. Health Servs. Acquisition Corp.,* — U.S. ——, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988), we hold that Scott is entitled to a new trial.

## I.

The case of the United States against appellant Monroe W. Scott, Jr., was assigned for trial to Judge Tim C. Murphy on November 15, 1984. The prosecutor was an Assistant United States Attorney for the District of Columbia.[2] Following Judge Murphy's denial of Scott's motions to suppress identification evidence and to release Scott on bond, trial commenced before a jury on November 30, 1984. The jury found Scott guilty of assault with intent to kill while armed. D.C.Code §§ 22–501, –3202 (1981 & Supp.1988). On January 28, 1985, Judge Murphy sentenced Scott to imprisonment for twelve to thirty-six years and fined him $500. Scott filed a timely notice of appeal.

During Scott's trial and sentencing, Judge Murphy was engaged in discussions with the United States Department of Justice about employment as an attorney in

the Executive Office for United States Attorneys. The discussions began in October 1984, when Judge Murphy mentioned to the Director of the Office of Management Information, Services, and Support (OMISS) of the Executive Office for United States Attorneys, that he was contemplating a career change in 1985 and learned that the position of Assistant Director for the Debt Collection Staff was vacant.[3] On October 31, 1984, and on December 10, 1984, Judge Murphy had lunch with the Director who described the position in detail. The Director advised that the Debt Collection Staff provided policy and oversight guidance to the debt collection units of the United States Attorneys Offices across the country and operated as a part of OMISS, which had essentially a record-keeping and computer systems management function. The position of Assistant Director was managerial in nature and did not have direct litigation control. The Director offered the position to Judge Murphy "subject to higher approval."[4] On December 24, 1984, Judge Murphy told the Director that he was interested in the position and asked the Director to discuss the matter with his superiors. Judge Murphy was formally offered the job on or about February 6, 1985. Two days later he advised the Chief Judge of the Superior Court and the District of Columbia Commission on Judicial Disabilities and Tenure that he would leave the bench by April 15, 1985, to accept the Debt Collection position of "senior litigation counsel," a title of distinction given in recognition of Judge Murphy's judicial position.

Judge Murphy did not disclose the fact of his negotiations to Scott or his counsel at any time. Scott first learned of the

1. See Appendix I. This case was originally decided by a three-judge panel, *Scott v. United States,* 536 A.2d 1040 (D.C.1987). On June 20, 1988, the court granted rehearing en banc and vacated the panel opinion.

2. In the District of Columbia, the United States Attorney for the District of Columbia, which is a part of the United States Department of Justice, prosecutes violations of the District of Columbia criminal code. D.C.Code § 23–101(c) (1981).

3. The facts bearing on the judicial recusal issue are set forth in an affidavit filed by Judge Murphy after Scott had filed his motion to vacate the judgment of conviction and are not in dispute.

4. It is unclear from Judge Murphy's affidavit at which luncheon the conditional offer was extended to him. For purposes of this appeal it is sufficient that the prospect of his employment at OMISS was seriously discussed at both meetings.

judge's negotiations for employment with the Department of Justice approximately two weeks after he had been sentenced. On February 14, 1985, an article in the *Washington Post* announced Judge Murphy's pending retirement from the Superior Court. On August 20, 1985, with leave of this court, Scott filed a motion to vacate his conviction and sentence, D.C.Code § 23–110 (1981), on the grounds that the judge's failure to disclose the employment negotiations violated the American Bar Association Code of Judicial Conduct and denied Scott due process of law. The motion was denied by Judge Reggie Walton, citing *Womack v. United States*, 129 U.S.App. D.C. 407, 395 F.2d 630 (1968), on the ground that it would be inappropriate and unnecessary to resolve Scott's claim since a direct appeal was pending and Scott could raise the issue of judicial disqualification in his appeal from the denial of his motion. Scott filed a timely appeal. Since the issue of judicial recusal is before us on an adequate record, we turn to that issue.

II.

Our criminal justice system is founded on the public's faith in the impartial execution of duties by the important actors in that system. *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810–811, 813–815, 107 S.Ct. 2124, 2139, 2141, 95 L.Ed.2d 740 (1987). It is beyond dispute that the trial judges perform a unique and pervasive role in that system: "confidence in the judiciary is essential to the successful functioning of our democratic form of government." *United States v. Quattrone*, 149 F.Supp. 240, 242–43 (D.D.C. 1957) (Youngdahl, J.). As eloquently stated by Mr. Justice Frankfurter:

Criminal justice is concerned with the pathology of the body politic. In administering the criminal law, judges wield the most awesome surgical instruments of society. A criminal trial, it has well been said, should have the atmosphere of the operating room. The presiding judge determines the atmosphere. He is not an umpire who enforces the rules of the game, or merely a moderator between contestants. If he is adequate to his function, the moral authority which he radiates will inspire the indispensable standards of dignity and austerity upon those who participate in a criminal trial.

*Sacher v. United States*, 343 U.S. 1, 37–38, 72 S.Ct. 451, 468–469, 96 L.Ed. 717 (1952) (Frankfurter, J., dissenting). *See also Byrd v. United States*, 377 A.2d 400, 404 (D.C.1977) ("The essence of the judicial role is neutrality.").[5]

To obtain the public trust in the judiciary judges are required to adhere to high standards of conduct. *See generally* CODE OF JUDICIAL CONDUCT. According to the chairman of the ABA committee which drafted the Code of Judicial Conduct, the Code was designed to protect public confidence in the integrity of judges since "[a]n independent and honorable judiciary is an indispensible condition of justice in our society." *Judicial Disqualification: Hearings on S. 1064 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary*, 93d Cong., 1st Sess. 80 (1973).

■ Canon 3(C)(1) of the Code of Judicial Conduct provides in relevant part: "A judge *should* disqualify himself in a proceeding in which his impartiality *might reasonably be questioned....*" CODE OF JUDICIAL CONDUCT Canon 3(C)(1) (emphasis added).[6] The necessity for recusal in a

---

5. The Framers of our Constitution were aware of the necessity of an impartial judiciary within our governmental structure. *See O'Donoghue v. United States*, 289 U.S. 516, 531, 53 S.Ct. 740, 743, 77 L.Ed. 1356 (1933) ("'The complete independence of the courts of justice is peculiarly essential in a limited Constitution.'") (quoting THE FEDERALIST No. 78 (A. Hamilton)); Chief Justice John Marshall's Remarks at the Debates of the Virginia State Convention of 1829–30 ("It is to the last degree important, that he [the judge]

should be rendered perfectly and completely independent, with nothing to influence or control him but God and his conscience [ ]....").

6. The American Bar Association's Code of Judicial Conduct applies to judges of the District of Columbia Superior Court and the District of Columbia Court of Appeals. 1973 D.C. COURTS ANN REP. 8; *see, e.g., In re Evans*, 411 A.2d 984, 996 (D.C.1980) (reversing conviction for criminal contempt on grounds of appearance of judicial bias in violation of Canon 3(C)(1) (1972));

case is premised on an objective standard.[7] Because Canon 3(C) is incorporated into the federal judicial qualification statute, 28 U.S.C. § 455, see Appendix II, federal decisions interpreting the statute are instructive.[8] Thus, even before the recent decision of the Supreme Court in *Liljeberg, supra*, —— U.S. ——, 108 S.Ct. 2194, 100 L.Ed.2d 855, it was clear from the federal circuit court opinions that a judge must recuse from any case in which there is "an *appearance* of bias or prejudice sufficient to permit the average citizen reasonably to question [the] judge's impartiality." *United States v. Heldt*, 215 U.S.App.D.C. 206, 239, 668 F.2d 1238, 1271 (1981), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982) (footnote and citations omitted). The objective standard is required in the interests of ensuring justice in the individual case and maintaining public confidence in the integrity of the judicial process which "depends on a belief in the impersonality of judicial decision making." *United States v. Nobel*, 696 F.2d 231, 235 (3d Cir.1982), *cert. denied*, 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983). *See generally*, Note, *Disqualification of Judges and Justices in the Federal Courts*, 86 HARV.L.REV. 736, 746 (1973). Neither bias in fact nor actual impropriety is required to violate the Canon. *Hall v. Small Business Admin.*, 695 F.2d 175, 178–79 (5th Cir.1983) (federal disqualification statute "focuses on what is revealed to the parties and the public, as opposed to the existence in fact of any bias or prejudice [and] cannot ... extend to ... the judge's actual virtue").

■ Judge Murphy served as a Superior Court Judge in active service for over eighteen years before he assumed senior status, and his good reputation is not at issue here. Violations of the Canons based on appearances is ⌐unquestionably a difficult area in which reasonable people can harbor

---

*Halleck v. Berliner*, 427 F.Supp. 1225, 1240 (D.D.C.1977) (Code of Judicial Conduct specifies "conduct which warrants disciplinary action" and accordingly supplements D.C.Code § 11–1526(a)(2)(C) (1981) which provides for the removal of District of Columbia judges for "any ... conduct which is prejudicial to the administration of justice or which brings the judicial office into disrepute"); *cf. In re Bell*, 373 A.2d 232, 235 (D.C.1977) (Super.Ct.Civ.R. 63–I, bias or prejudice of a judge in violation of Canon 3(C)(1) (1972)). See Appendix I.

7. The Canon makes explicit that its statement of the instances in which recusal is required is not all inclusive. See Appendix I. In one Justice's view,

[w]hen there is ground for believing that such unconscious feelings may operate in the ultimate judgment, or may not unfairly lead others to believe they are operating, judges recuse themselves. They do not sit in judgment. They do this for a variety of reasons. The guiding consideration is that the administration of justice should reasonably appear to be disinterested as well as be in fact.

*Public Utilities Comm'n v. Pollak*, 343 U.S. 451, 466–67, 72 S.Ct. 813, 822–823, 96 L.Ed. 1068 (1952) (Frankfurter, J., concurring).

8. The language of Canon 3(C)(1) is substantially similar to the federal statute, 28 U.S.Code § 455(a) (Supp.1988), which governs the conduct of federal judges and is intended to conform with Canon 3(C). *Liljeberg, supra*, —— U.S. at —— n. 7, 108 S.Ct. at 2201 n. 7, 100 L.Ed.2d at 871 n. 7. See Appendix II. *See Warren v. United States*, 436 A.2d 821, 841 & n. 45 (D.C.

1981) (look to federal opinions construing federal rule in interpreting identical local rule); *Bell, supra*, 373 A.2d at 233 (cases construing 28 U.S.Code § 144 guide construction of Super.Ct. Civ.R. 63–I).

28 U.S.C.A. § 455 (Supp.1988) provides in pertinent part:

(a) Any justice, judge, or magistrate of the United States *shall* disqualify himself in any proceeding in which his impartiality might reasonably be questioned. [Emphasis added].

The federal statute uses the word "shall" rather than "should" but the semantic difference is without legal significance. Although "shall" most clearly defines a mandatory directive, use of the word "should" is not merely expressing aspirational goals since, "used in auxiliary function 'should' expresses duty, obligation, necessity, propriety, or expediency." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 2104 (1969). The commentary accompanying Canon 3(C) indicates that it is contemplated that "[u]nder appropriate circumstances, the fact that '[a judge's] impartiality might reasonably be questioned' under Canon 3C(1) ... may *require* his disqualification." CODE OF JUDICIAL CONDUCT Canon 3(C)(1) commentary (emphasis added). In promulgating, in April 1973, the Code of Judicial Conduct for United States Judges, which was based upon the American Bar Association's Code of Judicial Conduct, the Judicial Conference of the United States substituted "shall" for "should" in Canon 3(C)(1). CODE OF JUDICIAL CONDUCT FOR UNITED STATES JUDGES Canon 3(C)(1), *reprinted in* 69 F.R. D. 273, 277 (1973).

differing views. Nevertheless, presented with the facts before us, the court concludes that there is a violation of Canon 3(C)(1) when the trial judge who is presiding at the prosecution by the United States Department of Justice through the United States Attorney's Office is actively negotiating for employment with the Department's Executive Office for United States Attorneys. This circumstance presents the specter of partiality that the Canon and the Supreme Court entreat all judges scrupulously to avoid. The employment sought by the trial judge involved "oversight responsibility and policy guidance to the Debt Collection Units in the United States Attorney's offices," and consequently from the perspective of "the average person," a fully informed person might reasonably question whether the judge "could decide the case with the requisite aloofness and disinterest when he [was seeking] employment [in the prosecutor's executive office in the department prosecuting] the case." *Pepsico, Inc. v. McMillen,* 764 F.2d 458, 461 (7th Cir.1985). The situation does not change because of the trial judge's general reputation among his colleagues and the legal community. Nor does it change simply because the prospective employer is a component of the Department of Justice; the negotiations at issue for employment with a unit directly linked to the prosecutor's office are ethically analogous to negotiations for employment with a large private law firm. As stated by Judge Posner, "[t]he dignity and independence of the judiciary are diminished when the judge comes before the lawyers in the case in the role of a suppliant for employment. The public cannot be confident that a case tried under such conditions will be decided in accordance with the highest tradition of the judiciary." *Id.* Accordingly, we hold that Judge Murphy violated Canon 3(C)(1) when he presided at Scott's trial while he was actively seeking employment with the Executive Office for United States Attorneys.

The United States has conceded that Judge Murphy violated the Canon in presiding at Scott's trial and in imposing sentence during his employment negotiations. From the violation, it follows, as the United States also concedes, that had Scott learned of these negotiations prior to or during his trial, he would have been entitled to the issuance of a writ of mandamus if the trial judge had declined to recuse himself from the case. *See, e.g., id.* Accordingly, we must determine the post-trial relief to which Scott is entitled.

The traditional harmless error rule applied in criminal cases, *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946) (nonconstitutional harmless error); *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967) (constitutional harmless error), which focuses on the harm that an error by the trial judge has on the outcome of the case, has inherent limitations. As described in *Young, supra,* 107 S.Ct. at 2141, harmless error analysis "is best suited for the review of discrete exercises of judgment by lower courts, where information is available that makes it possible to gauge the effect of a decision on the trial as a whole." The traditional harmless error rule, moreover, presumes the existence of an impartial judge. *Rose v. Clark,* 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed. 2d 460 (1986).

■ In addition, a review of the record for actual prejudice under the traditional harmless error standard would be inconsistent with the goal of Canon 3(C)(1) to prevent even the appearance of impropriety. Indeed, if the goal of recusal were simply to protect the litigants from actual prejudice, it would logically follow that the Canon would provide that litigants could waive any conflict if they believed that the judge would nonetheless be impartial. But the Canon permits waiver only in limited circumstances not applicable here. *See* CODE OF JUDICIAL CONDUCT Canon 3(D).[9]

---

**9.** See Appendix I. Litigants in the federal courts can never waive a *conflict* set forth in § 455(b) which includes the conflicts of Canon 3(C)(1)(c) and (d). 28 U.S.C. § 455(e) (1982);

see Appendix II. Although § 455 expressly allows the parties to waive a trial judge's disqualification "in any proceeding in which his impartiality might reasonably be questioned," *id.,* the

The negative implication of the waiver provision is that the appearances of partiality proscribed by Canon 3(C)(1)(a) and (b) can never be waived by the litigants regardless of the immateriality of the Canon violation. Thus, the Canons implicitly recognize that some appearances of impropriety are so compelling that, given the purposes of the Canons, they can never be waived or be deemed harmless.

▪ Furthermore, a defendant is not required to show prejudice from a violation of the standard set by Canon 3(C)(1) as would affect the outcome of the trial in order to be entitled to the extraordinary writ of mandamus. *See Pepsico v. McMillen, supra,* 764 F.2d at 461.[10]

In *Liljeberg, supra,* —— U.S. ——, 108 S.Ct. 2194, 100 L.Ed.2d 855, the Supreme Court had to decide whether the appearance of judicial impropriety gives rise to a fully retroactive remedy without an actual attempt to measure prejudice or whether the harmless error rule only provides a prospective remedy unless a litigant could show actual prejudice.[11] Loyola University had contracted to sell a tract of its land to Liljeberg for the construction of a hospital, subject to a buy-back clause which Loyola could trigger if Liljeberg did not secure a construction contract within one year or if the rezoning of Loyola's land adjacent to the hospital was not accomplished. At the time, the district court judge, a trustee of Loyola, was presiding over litigation brought by a third party, Health Services Acquisition Corp. (HSA), with whom Liljeberg had negotiated for the construction of the hospital on a different site. HSA claimed that Liljeberg had transferred ownership of a state-issued certificate of need for a hospital to it.[12] Consequently, if the litigation was not resolved in Liljeberg's favor, Loyola could trigger the buy-back provision and thus lose the financial benefits associated with the hospital's construction. The district court judge, sitting without a jury, credited Liljeberg's testimony that pursuant to oral conversations between the parties transfer of ownership of the certificate of need was subject to conditions which HSA had not satisfied.

Ten months after the United States Court of Appeals for the Fifth Circuit had affirmed the judgment for Liljeberg, HSA learned that the district court judge was a trustee of Loyola University while Liljeberg was negotiating with Loyola and that the judge had regularly attended trustee meetings in which the progress of the hos-

---

federal waiver provisions represent a clear departure from the waiver provisions of the ABA Code of Judicial Conduct which govern in District of Columbia courts. Scott's case, of course, does not involve waiver, and the definition of the circumstances under which waiver may be consistent with Canon 3(C)(1) is not before us.

10. In *Pepsico, Inc. v. McMillen,* a "head hunter" acting on behalf of the district court judge had contacted the law firms of the counsel appearing on behalf of the litigants about future employment for the judge. Although the judge was "of unblemished honor and sterling character," the Seventh Circuit Court of Appeals concluded that it was inevitable the parties "would entertain a significant doubt that justice would be done in the case," and "wonder whether Judge McMillen might not at some unconscious level favor the firm ... that had not as definitively rejected him." 764 F.2d at 460, 461. The court acknowledged that it reached its conclusion reluctantly, but considered it necessary notwithstanding the fact that the law firms had declined to consider the judge for future employment and there was no indication that the judge was disappointed, since he had set several conditions for his future employment.

11. The Court observed:

Although § 455 defines the circumstances that mandate disqualification of federal judges, it neither prescribes nor prohibits any particular remedy for a violation of that duty. Congress has wisely delegated to the judiciary the task of fashioning the remedies that will best serve the purpose of the legislation.

—— U.S. at ——, 108 S.Ct. at 2203, 100 L.Ed.2d at 874.

Prior to *Liljeberg,* the circuit courts were not in agreement whether the harmless error rule required a retroactive remedy in the absence of a showing of prejudice. *Compare Health Servs. Acquisition Corp. v. Liljeberg,* 796 F.2d 796 (5th Cir.1986) *and Hall, supra,* 695 F.2d at 180, *with United States v. Murphy,* 768 F.2d 1518, 1540 (7th Cir.1985).

12. The certificate was essential for the successful operation of a hospital; without it a hospital would not qualify for health care reimbursement payments under the federal medicare and medicaid programs.

pital project negotiations was discussed, including that the success of the negotiations depended upon the issuance of the certificate of need to Liljeberg. The Supreme Court held that the judge had violated § 455(a) because his conduct gave rise to the appearance of impropriety, and that HSA was entitled to relief under Fed.R.Civ.P. 60(b)(6) [13] even though the judgment had become final.[14] "[S]cienter is not an element of a violation of § 455(a)," Justice Stevens wrote for the majority of the Court, and while "[t]he judge's lack of knowledge of a disqualifying circumstance may bear on the question of remedy, ... it does not eliminate the risk that 'his impartiality might reasonably be questioned' by other persons." *Id.* — U.S. at —, 108 S.Ct. at 2202, 100 L.Ed.2d at 872. Relying on the absence of a requirement of actual knowledge in § 455(a), as compared to its requirement in § 455(b)(4),[15] and on the advancement of the purposes of promoting public confidence in the integrity of the judicial process, *id.* — U.S. at —, 108 S.Ct. at 2202, 100 L.Ed.2d at 872–73, the Court rejected the view that a statutory violation should be applied prospectively only, holding that "in proper cases" the provision can be applied retroactively and establishing a special harmless error test for determining when a retroactive remedy was appropriate.

The Court acknowledged that not every violation required an automatic reversal of a judgment:

> As in other areas of the law, there is surely room for harmless error commit-

ted by busy judges who inadvertently overlook a disqualifying circumstance. There need not be a draconian remedy for every violation of § 455(a). It would be equally wrong, however, to adopt an absolute prohibition against any relief in cases involving forgetful judges.

*Id.* — U.S. —, 108 S.Ct. at 2203, 100 L.Ed.2d at 873–74 (footnote omitted). However, the Court viewed the traditional harmless error prejudice test inappropriate where the appearance of impropriety taints the entire proceeding and inadequate to accomplish what the Court has repeatedly affirmed is vital to that criminal justice system. *Id.* — U.S. —, 108 S.Ct. at 2203, 100 L.Ed.2d at 874–75; *see Vuitton, supra,* 107 S.Ct. at 2138–40 ("narrow focus of harmless error analysis is not ... sensitive to this underlying concern [that "an appearance of impropriety diminishes faith in the fairness of the criminal justice system in general"]); *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 823, 106 S.Ct. 1580, 1586, 89 L.Ed.2d 823 (1986) (concern about appearances has constitutional dimensions involving due process); *see also In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954); · *Tumey v. Ohio,* 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927). It therefore concluded that

> in determining whether a judgment should be vacated for a violation of § 455, it is appropriate to consider the risk of injustice to the parties in the

---

**13.** Fed.R.Civ.P. 60(b)(6) provides in relevant part:

> On motion and upon such terms as are just, the court may relieve a party ... from a final judgment ... for the following reasons: * * * (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time....

This rule is identical to Super.Ct.Civ.R. 60(b)(6).

**14.** The dissenting justices took issue with the majority view that constructive knowledge could be the basis for a violation of § 455 and that the judgment should be set aside under Rule 60(b)(6). They thought that the "extraordinary circumstances" limitation in Rule 60(b)(6) should not be applied retroactively since the trial judge had no personal financial interest in

the transactions between the parties and Loyola and had no connection with the board committee responsible for negotiating the sale of land. They also thought the fact that considerable time had passed since the entry of judgment weighed against granting relief. Also, the dissenters pointed out that the trial judge made no rulings after he acquired actual knowledge. *See Liljeberg, supra,* — U.S. —, 108 S.Ct. at 2207, 100 L.Ed.2d at 878 (Rehnquist, C.J., dissenting, joined by White, J., and Scalia, J.). Justice O'Connor, also dissenting, would have remanded the case to the lower courts for the determination of whether extraordinary circumstances justified setting aside the judgment. *Id.* — U.S. at —, 108 S.Ct. at 2209, 100 L.Ed.2d at 881.

**15.** See Appendix II.

particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process. We must continuously bear in mind that "to perform its high function in the best way 'justice must satisfy the appearance of justice.'"

*Liljeberg, supra,* —— U.S. at ——, 108 S.Ct. at 2204, 100 L.Ed.2d at 875 (quoting *In re Murchison, supra,* 349 U.S. at 136, 75 S.Ct. at 625).

In applying this special harmless error test the Court first analyzed the risk that public faith in the judiciary would be undermined as a result of the violation. The extent of the risk is, of course, dependent upon the circumstances surrounding the violation. Accepting the finding on remand, that at the time of trial the judge did not have actual knowledge of Loyola's interest in the dispute over ownership of the certificate of need, the Court noted that personal concerns are often forgotten by busy federal judges. *Id.* "The problem, however," Justice Stevens wrote, "is that people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges." *Id.*[16] Since "[t]he very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible," the Court deemed it "critically important in a case of this kind to identify the facts that might reasonably cause an objective observer to question [the trial judge's] impar-

tiality." *Id.* (citations omitted). These facts provide guidance for our determination of the post-trial relief to which Scott is entitled.

First, the Court considered it remarkable that the district court judge, who had regularly attended trustee meetings since 1977, "completely forgot about the University's interest in having a hospital constructed on its property...." *Id.* —— U.S. at ——, 108 S.Ct. at 2205, 100 L.Ed.2d at 875–76. The Court also viewed as "an unfortunate coincidence" the fact that the judge had missed the trustee meeting that took place after the two-day trial and while he still had the case under advisement.[17] The Court further characterized as "remarkable —and quite inexcusable" that the judge failed to recuse himself when, only a few days after he had filed his opinion, he once again obtained actual knowledge of Loyola's interest in the law suit; if the judge had then disclosed his interests, HSA could have filed a motion for a new trial within the authorized 10–day period following entry of judgment. *Id.* —— U.S. at ——, 108 S.Ct. at 2205, 100 L.Ed.2d at 876.[18] The final fact which created the impropriety was the failure of the judge to acknowledge, in denying HSA's motion to vacate the judgment, that he had known about Loyola's interest shortly before and immediately after the trial. *Id.* These "facts create precisely the kind of appearance of impropriety that § 455(a) was intended to prevent." *Id.* —— U.S. at ——, 108 S.Ct. at 2206, 100 L.Ed.2d at 877. Consequently, in

16. The Court recalled its recent decision in *Aetna Life Ins. Co. v. Lavoie, supra,* 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 holding that there was a violation of due process where, without a finding of actual influence, it was sufficient that sitting on the case "'would offer a possible temptation to the average ... judge to ... lead him not to hold the balance nice, clear and true.'" *Id.* at 825, 106 S.Ct. at 1587 (quoting *Ward v. Village of Monroeville,* 409 U.S. 57, 60, 93 S.Ct. 80, 83, 34 L.Ed.2d 267 (1972), in turn quoting *Tumey, supra,* 273 U.S. at 532, 47 S.Ct. at 444). The Court noted that even "[a] finding by another judge—faced with the difficult task of passing upon the integrity of a fellow member of the bench—that his or her colleague merely possessed constructive knowledge, and not *actual* knowledge, is unlikely to significantly quell the concerns of the skeptic." *Id.* ——

U.S. at ——, n. 12, 108 S.Ct. at 2205, n. 12, 100 L.Ed.2d at 875 n. 12.

17. The minutes of that meeting indicated "that representatives of the University monitored the progress of the trial, but did not see fit to call to the judge's attention the obvious conflict of interest that resulted from having a university trustee preside over that trial." *Id.*

18. In the Court's view:

A full disclosure at that time would have completely removed any basis for questioning the Judge's impartiality and would have made it possible for a different judge to decide whether the interests—and appearance—of justice would have been served by a retrial. *Id.*

the Court's view, the statutory violation was "neither insubstantial nor excusable" since the judge should have known of his fiduciary interest in the litigation, and since his failure to stay informed may, of itself, have constituted a violation of § 455(c). *Id.*

Addressing whether denial of relief will produce injustice in other cases, the Court opined that, rather than resulting in injustice in other cases, vacating the judgment would have prophylactic value since it might prevent a substantive injustice in a future case by encouraging greater sensitivity to the concerns underlying § 455 among litigants and judges and prompt disclosure upon discovery. *Id.* Finally, with respect to fairness to the particular litigants, the Court noted that neither Liljeberg nor Loyola had made a showing of "special hardship by reason of their reliance on the original judgment." *Id.* ── U.S. at ──, 108 S.Ct. at 2207, 100 L.Ed.2d at 877–78 (footnote omitted). HSA's motion for relief was timely, the ten-month delay after affirmance of the judgment for Liljeberg being occasioned solely by the district court judge's failure to disqualify himself; further delay was occasioned by the judge's failure to disclose his involvement at the time HSA filed its motion to vacate. Accordingly, using as its hallmark the proposition that "[t]he guiding consideration is that the administration of justice should reasonably appear to be disinterested as well as be so in fact," [19] the Court viewed the vacatur of the judgment as "an eminently sound and wise disposition of this case." *Id.* ── U.S. at ──, 108 S.Ct. at 2207, 100 L.Ed.2d at 878.

■ *Liljeberg* thus makes clear that Canon 3(C)(1), as incorporated in § 455, see note 8, *supra,* envisions a continuum of conduct which may or· may not require vacation of a judgment. The appearance of partiality, and not only actual partiality, constitutes a statutory violation, and no showing is required that the judge has either a direct financial interest in the litigation, *see, e.g., Lavoie, supra,* 475 U.S. at *831, 106* S.Ct. at 1590; *Tumey, supra,* 273

U.S. at 532, 47 S.Ct. at 444, or actual knowledge of his or her interest in the case at the time the judge presides. *Liljeberg, supra,* ── U.S. at ──, 108 S.Ct. at 2202, 100 L.Ed.2d at 872. Further, a retroactive remedy is available, without a showing of actual prejudice, upon a balancing of three risks—injustice to the particular litigants, injustice to other litigants as a result of affording relief to the particular litigants, and undermining public confidence in the judicial system. Although this is not the occasion to define the variety of circumstances in which a new trial would be required for violation of Canon 3(C)(1), whether mandamus relief would or would not otherwise be warranted, the *Liljeberg* test identifies the relevant factors to be taken into account by the trial judge as well as by this court in determining the appropriate remedy for a Canon violation. Accordingly, we adopt the *Liljeberg* harmless error test for violations of Canon 3(C)(1), and conclude that Scott's conviction must be vacated and Scott afforded a new trial.

■ Viewing the nature of the violation and its effect on the public's faith in the judiciary, we are persuaded that an objective observer might have difficulty understanding that Judge Murphy did not, at any time throughout Scott's trial and sentencing, realize "the problem" that others might question his impartiality. The United States Attorney for the District of Columbia had filed the indictment and an Assistant U.S. Attorney was presenting the government's case against Scott. While presiding at Scott's trial Judge Murphy was seeking employment directly relating to the operations of United States Attorneys' offices.

We can only conclude that Judge Murphy experienced what must have been an inadvertent lack of appreciation of the significance of his conduct with respect to Canon 3(C). His continued discussions with the Director of OMISS demonstrated that obtaining a new job was important to the judge. The discussions involved a series of

---

**19.** *Public Utilities Comm'n v. Pollak, supra* note 7, 343 U.S. at 466–67, 72 S.Ct. at 823.

discrete and continuing events throughout the time that Scott's case was assigned to Judge Murphy and each occasion provided the opportunity for the judge to become alert to "the problem" that Scott and others might "indulge suspicions and doubts" about his partiality. *Id.* —— U.S. at ——, 108 S.Ct. at 2204, 100 L.Ed.2d at 875. By December 23, 1984, when he had decided to accept the position in the Executive Office for United States Attorneys, the judge had a duty to recuse himself from Scott's case. These facts present "precisely the kind of appearance of impropriety" that Canon 3(C)(1) is designed to prevent. *Id.*

As to the risk of injustice in other cases should Scott be granted relief, we agree with the Supreme Court's observation in *Liljeberg* that relief would have prophylactic value. That there are few reported decisions involving a violation of Canon 3(C)(1) suggests that judges are sensitive to the systemic needs served by the Canon's requirements for recusal or disclosure with waiver. The fact that a conscientious judge of Judge Murphy's caliber would find himself confronted with a concession by the United States Attorney that he violated Canon 3(C) indicates, however, there is a need to encourage careful examination by litigants and judges of the circumstances giving rise to concerns under Canon 3(C). In *Liljeberg*, the Supreme Court was concerned with the problem of busy federal court judges who handle complex cases and can easily forget personal matters. *Id.* —— U.S. at ——, 108 S.Ct. at 2203, 100 L.Ed.2d at 873–74. A comparable circumstance invoking concern exists for urban court judges who are engulfed with cases to decide.[20] We have no basis on which to conclude that granting relief to Scott will produce injustice in other cases. Hence, there is no warrant for this court to slacken its responsibility to assure that sensitivity to the purposes of the Canon is heightened.

Finally, we perceive little or no risk of unfairness to the particular litigants in granting Scott's motion. The United States, representing the interests of society has, of course, an obvious and important interest, as does this court, in avoiding, under usual circumstances, the vacation of a conviction when a defendant has not suffered prejudice under traditional harmless error analysis. The societal costs involved in a new trial necessarily cause us to proceed with caution in granting retroactive relief. Consequently, it is significant that the United States has not suggested there would be special hardship in retrying Scott. Further, the government's reliance interest clearly is not as great as it would be if Scott's appeal from his conviction had been affirmed. Scott filed his motion to vacate before briefs in his direct appeal from his conviction had been filed, and his failure to act earlier was attributable to Judge Murphy's failure to disclose his employment discussions.

That Scott does not claim that his trial was unfair or that Judge Murphy was actually biased against him is not dispositive. The factors deemed by the Supreme Court as significant in determining that *Liljeberg* was an appropriate case in which to apply a retroactive remedy are present in Scott's case. Furthermore, our review of the record demonstrates that like any trial judge, Judge Murphy was intimately involved with the conduct of Scott's case, even though he did not sit as the trier of fact. Judge Murphy made factual determinations involving credibility in denying Scott's motion to suppress identification evidence and also denied his request for a self defense instruction and overruled objections to prosecutorial misconduct during closing argument. The *Liljeberg* special harmless error test makes clear, moreover, that it hardly would be appropriate to place on a criminal defendant the burden to attack a judge's integrity. Rather, the duty to ensure judicial conduct in accordance with the Canons resides, at least in part,

---

**20.** In retiring, Judge Murphy noted the need for judicial sabbaticals. He had served for almost three years as the presiding judge of the Criminal Division of the Superior Court, and it is our understanding that throughout his eighteen and one half years of service as an active judge he served principally in the Criminal Division.

with this court.[21]

Insubstantial and fully excusable appearances of partiality will be unlikely to justify a new trial in a criminal case in order to assure that the purposes of Canon 3(C)(1) are fulfilled.[22] What occurred here, however, involved a trial judge who, at all times while he was presiding at Scott's trial and sentencing, was, unknown to Scott, either seeking or had accepted employment in the executive office for all federal prosecutors while one of those prosecutors was prosecuting Scott. A remand for resentencing would be inadequate to cure the harm. Indeed, the commendable concessions by the United States remove any doubt that this case falls at a point along the continuum of conduct reached by the Canon that requires a new trial in order to assure the continued public confidence in the integrity of the judiciary.[23]

Accordingly, the judgment denying the motion to vacate is reversed and the case is remanded for a new trial.[24]

*Reversed and remanded.*

## APPENDIX I

BE IT RESOLVED: All active judges on the Court of Appeals and the Superior Court shall conform to the Code of Judicial Conduct adopted by the House of Delegates of the American Bar Association on August 16, 1972: *Provided,* however, That (1) the prohibition against arbitration and mediation in Canon 5 E shall not be applicable to proceedings authorized by law in the Small Claims and Conciliation Branch of

**21.** This court has recently reaffirmed its view of the centrality of the appearance of judicial impartiality to our justice system. In *In re Campbell,* 522 A.2d 892 (D.C.1987), involving the disbarment of a former trial judge for conviction of a crime of moral turpitude (receipt of an illegal gratuity on or because of an official act, in violation of 18 U.S.C. § 201(g)), the court embraced, as "correctly captur[ing] society's expectations for members of the judiciary," a statement by the District of Columbia Board on Professional Responsibility which reads in part:

[W]hen one contemplates the essence of judicial office, society commits enormous power into the hands of judges, particularly trial judges, because of an abiding faith that those judges will act impartially and without fear or favor. * * * Society grants judges such enormous power exactly because of its confidence that judges will act fairly and impartially. * * * In other words, the appearance of justice is as important as the fact of justice where those who sit in judgment are concerned. It is precisely because of our strongly held beliefs about the appearance and the fact of impartiality that judges are subject to the excruciatingly high ethical standards that we impose on them. * * * Put another way, society must protect the integrity of the judicial system so that people will submit their disputes to that system and abide by its judgments, at least in part, of their own free will.

*Id.* at 896.

**22.** Under the Canons the trial judge can either recuse himself or herself or, in limited circumstances, inform the parties of the matter giving rise to an appearance of impropriety in order to determine whether or not they are willing to waive any objection. *See* Canon 3(D), *supra.* The Superior Court has over fifty trial judges who, from time to time receive rotating assignments from the Chief Judge to one of the five

divisions of the court. Hence, recusals need not unduly inconvenience the Superior Court. Indeed, when Congress adopted § 455(e), which limits the circumstances in which litigants can waive a conflict more narrowly than the ABA Code of Judicial Conduct, Congress recognized that its stricter treatment of waiver would not burden the administration of the federal courts' caseload because the case could be assigned to a number of other judges:

while the ABA Canon on disqualification would permit waiver [in more instances than § 455(e)], the committee believes that confidence in the impartiality of federal judges is enhanced by a more strict treatment of waiver. There are approximately 667 federal judges, active and retired. The statutes contain ample authority for chief judges to assign other judges to replace either a circuit or district court judge who becomes [sic] disqualified.

H.R.Rep. No. 93–1453, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 6351, 6357.

**23.** Had the connection between the prosecutor and the employment sought by the trial judge been more remote, our conclusion of the need for vacation of a conviction might well be different. The ethical considerations underlying the Canons are no less applicable to the U.S. Department of Justice than to a private law firm, but we need not decide whether a judge's negotiations for employment for any attorney position in the United States Department of Justice would necessarily cause an objective observer to question a judge's impartiality.

**24.** In view of our disposition, we do not address the claims of error raised in Scott's direct appeal from his convictions.

the Superior Court, and (2) for purposes of this resolution, Canon 3 D shall be amended by striking the words "in writing" from the second sentence of such subdivision and deleting the final sentence thereof: *Provided further,* That in lieu of the reporting requirements in Canon 6 C and Canon 5 C(4)(c) such judges shall file such financial statements with the Commission on Judicial Disabilities and Tenure as are required by D.C.Code 1967, § 11–1530 (Supp. V, 1972), and the regulations of such Commission.

This resolution shall be applicable to retired judges of both courts serving on a continuing or periodic basis to the extent that the section of the Code with respect to compliance makes the provisions of such Code applicable to part-time judges or retired judges.

The Joint Committee will act as an advisory body to any judge requesting an interpretative ruling with respect to particular factual situations that may arise.

This resolution shall become effective on February 16, 1973.

BY ORDER OF THE JOINT COMMITTEE ON JUDICIAL ADMINISTRATION.

## AMERICAN BAR ASSOCIATION CODE OF JUDICIAL CONDUCT

### Canon 3

### *CANON 3*

*A Judge Should Perform the Duties of His Office Impartially and Diligently*

The judicial duties of a judge take precedence over all his other activities. His judicial duties include all the duties of his office prescribed by law. In the performance of these duties, the following standards apply:

A. ADJUDICATIVE RESPONSIBILITIES.

(1) A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, public clamor, or fear of criticism.

(2) A judge should maintain order and decorum in proceedings before him.

(3) A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control.

*Commentary:* The duty to hear all proceedings fairly and with patience is not inconsistent with the duty to dispose promptly of the business of the court. Courts can be efficient and business-like while being patient and deliberate.

The testimony of a judge as a character witness injects the prestige of his office into the proceeding in which he testifies and may be misunderstood to be an official testimonial. This Canon, however, does not afford him a privilege against testifying in response to an official summons.

(4) A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.

*Commentary:* The proscription against communications concerning a proceeding includes communications from lawyers, law teachers, and other persons who are not participants in the proceeding, except to the limited extent permitted. It does not preclude a judge from consulting with other judges, or with court personnel whose function is to aid the judge in carrying out his adjudicative responsibilities.

An appropriate and often desirable procedure for a court to obtain the advice of a disinterested expert on legal issues is to invite him to file a brief *amicus curiae.*

(5) A judge should dispose promptly of the business of the court.

*Commentary:* Prompt disposition of the court's business requires a judge to devote adequate time to his duties, to be punctual in attending court and expeditious in determining matters under submission, and to insist that court officials, litigants and their lawyers cooperate with him to that end.

(6) A judge should abstain from public comment about a pending or impending proceeding in any court, and should require similar abstention on the part of court personnel subject to his direction and control. This subsection does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court.

*Commentary:* "Court personnel" does not include the lawyers in a proceeding before a judge. The conduct of lawyers is governed by DR7–107 of the *Code of Professional Responsibility.*

(7) A judge should prohibit broadcasting, televising, recording, or taking photographs in the courtroom and areas immediately adjacent thereto during sessions of court or recesses between sessions, except that a judge may authorize:

(a) the use of electronic or photographic means for the presentation of evidence, for the perpetuation of a record, or for other purposes of judicial administration;

(b) the broadcasting, televising, recording, or photographing of investitive, ceremonial, or naturalization proceedings;

(c) the photographic or electronic recording and reproduction of appropriate court proceedings under the following conditions:

(i) the means of recording will not distract participants or impair the dignity of the proceedings;

(ii) the parties have consented, and the consent to being depicted or recorded has been obtained from each witness appearing in the recording and reproduction;

(iii) the reproduction will not be exhibited until after the proceeding has been concluded and all direct appeals have been exhausted; and

(iv) the reproduction will be exhibited only for instructional purposes in educational institutions.

*Commentary:* Temperate conduct of judicial proceedings is essential to the fair administration of justice. The recording and reproduction of a proceeding should not distort or dramatize the proceeding.

## B. ADMINISTRATIVE RESPONSIBILITIES.

(1) A judge should diligently discharge his administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials.

(2) A judge should require his staff and court officials subject to his direction and control to observe the standards of fidelity and diligence that apply to him.

(3) A judge should take or initiate appropriate disciplinary measures against a judge or lawyer for unprofessional conduct of which the judge may become aware.

*Commentary:* Disciplinary measures may include reporting a lawyer's misconduct to an appropriate disciplinary body.

(4) A judge should not make unnecessary appointments. He should exercise his power of appointment only on the basis of merit, avoiding nepotism and favoritism. He should not approve compensation of appointees beyond the fair value of services rendered.

*Commentary:* Appointees of the judge include officials such as referees, commissioners, special masters, receivers, guardians and personnel such as clerks, secretaries, and bailiffs. Consent by the parties to an appointment or an award of compensation does not relieve the judge of the obligation prescribed by this subsection.

## C. DISQUALIFICATION.

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

(a) he has a personal bias or prejudice concerning a party, or personal knowledge

of disputed evidentiary facts concerning the proceeding;

(b) he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

*Commentary:* A lawyer in a governmental agency does not necessarily have an association with other lawyers employed by that agency within the meaning of this subsection; a judge formerly employed by a governmental agency, however, should disqualify himself in a proceeding if his impartiality might reasonably be questioned because of such association.

(c) he knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(d) he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) is acting as a lawyer in the proceeding;

*Commentary:* The fact that a lawyer in a proceeding is affiliated with a law firm with which a lawyer-relative of the judge is affiliated does not of itself disqualify the judge. Under appropriate circumstances, the fact that "his impartiality might reasonably be questioned" under Canon 3C(1), or that the lawyer-relative is known by the judge to have an interest in the law firm that could be "substantially affected by the outcome of the proceeding" under Canon 3C(1)(d)(iii) may require his disqualification.

(iii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) is to the judge's knowledge likely to be a material witness in the proceeding.

(2) A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

(3) For the purposes of this section:

(a) the degree of relationship is calculated according to the civil law system;

*Commentary:* According to the civil law system, the third degree of relationship test would, for example, disqualify the judge if his or his spouse's father, grandfather, uncle, brother, or niece's husband were a party or lawyer in the proceeding, but would not disqualify him if a cousin were a party or lawyer in the proceeding.

(b) "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

(c) "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, advisor, or other active participant in the affairs of a party, except that:

(i) ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

(ii) an office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

(iii) the proprietary interest of a policy holder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

(iv) ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

## D. REMITTAL OF DISQUALIFICATION.

A judge disqualified by the terms of Canon 3C(1)(c) or Canon 3C(1)(d) may, instead of withdrawing from the proceeding, disclose on the record the basis of his disqualification. If, based on such disclosure, the

parties and lawyers, independently of the judge's participation, all agree in writing that the judge's relationship is immaterial or that his financial interest is insubstantial, the judge is no longer disqualified, and may participate in the proceeding. The agreement, signed by all parties and lawyers, shall be incorporated in the record of the proceeding.

*Commentary:* This procedure is designed to minimize the chance that a party or lawyer will feel coerced into an agreement. When a party is not immediately available, the judge without violating this section may proceed on the written assurance of the lawyer that his party's consent will be subsequently filed.

### APPENDIX II

### 28 U.S.C. § 455 (Supp.1988)

§ 455. Disqualification of justice, judge, or magistrate

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

(c) A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

(d) For the purposes of this section the following words or phrases shall have the meaning indicated:

(1) "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

(2) the degree of relationship is calculated according to the civil law system;

(3) "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

(4) "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party, except that:

(i) Ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

(ii) An office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

(iii) The proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary in-

terest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

(iv) Ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

(e) No justice, judge, or magistrate shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

(June 25, 1948, ch. 646, 62 Stat. 908; Dec. 5, 1974, Pub.L. 93–512, § 1, 88 Stat. 1609; Nov. 6, 1978, Pub.L. 95–598, title II, § 214(a), (b), 92 Stat. 2661.)

SCHWELB, Associate Judge, concurring in the result:

This is, I think, a melancholy case for the judges of this court who must participate in it. It comes before us as a criminal appeal from a felony conviction, but the issue which we must decide *en banc* has only an incidental connection with Scott. Rather, eight judges, most or all of whom know Judge Murphy well, are required to grit their teeth[1] and pass on allegations that he transgressed ethical proscriptions in violation of the Code of Judicial Conduct. This duty is particularly unpleasant in this era of Operation Greylord and similar examples of judicial corruption, for we are not dealing here, by any stretch of the imagination, with a corrupt, dishonest, or incompetent judge. On the contrary, Judge Murphy has long been known in this community to be not just an able jurist but an outstanding one.[2] I hope that if the decision in this case is reported in the daily press or in publications which specialize in recounting developments in the legal community, someone will find it worthwhile to mention Judge Murphy's unchallenged probity and extraordinary accomplishments as well.

Deal with the issue we must, however, and given the government's belated concessions during oral argument when the case was heard *en banc*, I concur in the reversal of Scott's conviction. I reach that result, however, with far more hesitation than do my colleagues in the majority, and by an appreciably different route. Even today, after the government dramatically changed course and acknowledged that Judge Murphy violated Canon 3(C), I find this to be a very close and troubling case in which only the prosecutor's critical concessions have put Scott over the top.

I

I begin by remarking that I have no quarrel with much—perhaps most—of

---

1. That is true, at least, of me. In *Liljeberg v. Health Services Acquisition Corp.,* —— U.S. ——, 108 S.Ct. 2194, 2205 n. 12, 100 L.Ed.2d 855 (1988), the Supreme Court characterized a judge's task in passing on the integrity of a fellow member of the bench as a "difficult" one. That is surely no overstatement.

2. After Judge Murphy had completed his first term on the bench, he was evaluated for reappointment, as required by the Home Rule Act, D.C.Code § 11 App. 433(c) (1981 & 1988 Supp.), by the District of Columbia Commission on Judicial Disabilities and Tenure. The Commission stated in its report, in pertinent part, as follows:

> The Commission reserves the term "exceptionally well qualified" for those judges whose work product, dedication, demeanor, restraint, efficiency and legal scholarship are preeminent on the bench.
>
> \*    \*    \*    \*    \*    \*
>
> Based upon the tabulated results of polls and individual comments of scores of attorneys, Judge Murphy is the type of judge who by his daily example instills confidence in our judicial system. The comments indicate that persons who come into his courtroom feel they will receive a fair hearing. He is repeatedly described as "diligent"; "competent"; "fair"; "courteous"; "attentive"; "conscientious"; "always asks for more than his share of work"; and "pays attention to individuals in sentencing".
>
> For the foregoing reasons, the Commission finds that Judge Murphy's judicial service merits his automatic reappointment to the bench. The outstanding manner in which he has performed his duties as a judge, winning the respect and the confidence of the community in his courtroom and in the Superior Court require placement of Judge Murphy in the highest category. We therefore determine Judge Murphy exceptionally well qualified for reappointment.

104 Daily Wash.L.Rptr. 1756–57 (1976).

Chief Judge Rogers' legal analysis. As one who has emphasized the nobility of the law as a calling and the high standards to which its practitioners should be held,[3] I agree that, like that of Caesar's wife, the conduct of judges must be beyond reproach. In fact, I think that this obligation applies with even greater force to those of us who have been accorded the privilege of serving our fellow-citizens from the bench than it does to members of the legislative and executive branches. Aristotle taught two millennia ago that judges should be the very personification of justice. *Nicomachean Ethics*, Bk. V, ch. 4 (D.Ross.tran. 1975). His precision and eloquence come through even in translation; he called it like it is.

I also share the majority's view that traditional harmless error analysis, with its emphasis on a showing of prejudice, cannot apply when the issue is whether there is an appearance of partiality. Although there may be a narrow class of cases in which appearance of impropriety exists but is so attenuated that reversal is unnecessary, *see Liljeberg, supra,* —— U.S. at ——, 108 S.Ct. at 2203,[4] any requirement that a defendant demonstrate actual prejudice in this kind of case would so blur the difference between appearance of partiality and partiality in fact that the two concepts would all but merge. Not only must justice be done, but it must also seem to be done.

Finally, I agree with the proposition, implicit in the majority's allusion to the prosecutor's concessions, that the government's change of position put a different face on this appeal. Indeed, the government's effective acknowledgment during the argument *en banc* that Judge Murphy violated the Canon, and that Scott would have been entitled to a writ of mandamus requiring Judge Murphy's recusal if the negotiations with OMISS had been disclosed pretrial,

makes affirmance of the conviction very difficult. The case differs in this respect from many of the precedents and, I think, from the progeny which it may well spawn, for such concessions are not made every day.

My disagreement with my colleagues, then, relates to the application to the facts before us of legal principles to which they and I subscribe. Here, our differences are profound. In my view, any connection between OMISS and a felony trial in the Superior Court is far less significant than my colleagues suggest. The proposition that "an objective disinterested observer fully informed of the facts"[5] would reasonably apprehend that Judge Murphy might be influenced in his disposition of Scott's case by his negotiations with OMISS appears to me to be very dubious indeed. Accordingly, if there was any violation of the Canon at all, I view it more as an unfortunate but understandable slip-up on Judge Murphy's part than as a consistent and culpable failure to appreciate and carry out responsibilities that should have been obvious to him. This case is not *Liljeberg*, in which the judge was a trustee of a university which had a financial stake in the proceedings before him, and I cannot agree with my colleagues that "*these* facts present precisely the kind of appearance of impropriety that Canon 3(C)(1) is designed to prevent." Majority op. at 755 (emphasis added).

## II

An appearance of partiality or impropriety is not a pretty thing. Like beauty, however, it is in the eye of the beholder. Perspective is everything. It is therefore important, when we speak of an appearance of impropriety, to identify the observer to whom the judge's conduct must be shown to appear improper.

3. *See In re Shillaire,* 549 A.2d 336, 337–38 (D.C. 1988); *In re Dory,* 552 A.2d 518, 522 (D.C.1988) (concurring opinion).

4. As the Supreme Court said in *Liljeberg,* "there is surely room for harmless error committed by busy judges who overlook a disqualifying circumstance. There need not be a draconian remedy for every violation...." —— U.S. —— at ——, 108 S.Ct. at 2203.

5. *See Pepsico, Inc. v. McMillen,* 764 F.2d 458, 460 (7th Cir.1985).

Canon 3(C)(1) provides simply that the judge should disqualify himself when his impartiality might reasonably be questioned. It does not further elaborate on who might be doing the questioning. Judge Posner added some flesh to the bare bones of the language of the Canon when he framed the test as being

> whether an objective, disinterested observer *fully informed of the facts* underlying the grounds on which recusal was sought would entertain a significant doubt that justice would be done in the case.

*Pepsico, Inc. v. McMillen, supra,* 764 F.2d at 460 (emphasis added). Moreover, the critical perspective is not that of a supersensitive or highly suspicious individual who may perceive a conspiracy in every judicial nook and cranny, but that of a reasonable person. *In re Searches Conducted on March 5, 1980,* 497 F.Supp. 1283, 1291 (E.D.Wis.1980).

Applying these principles to the present case, we must first identify the facts that would be available to the "fully informed" observer. We must then determine whether, armed with those facts and the requisite impartiality, the observer would have a significant doubt, in light of Judge Murphy's dealings with OMISS, that he would treat Scott fairly. So far as I can discern, my colleagues do not contest that this is the issue before us.

Judge Murphy negotiated for and ultimately accepted employment with OMISS, which is within the Executive Office for United States Attorneys (EOUSA). The functions of EOUSA are outlined in 28 C.F.R. § 0.22 (1988). They are entirely nonlitigative in character. As the Department of Justice explains in a publication which describes the Department's legal activities,

> [w]hile the legal divisions are responsible for the supervision of litigation conducted by U.S. Attorneys, the Executive Office for United States Attorneys[6] has

certain supervisory responsibilities with regard to U.S. Attorneys' *non-litigative functions.*

*The Department of Justice ... The Nation's Litigator* 43–44 (1987) (emphasis added). Judge Murphy confirmed in his affidavit that "a litigative function was not contemplated as a part of my position at the time I was hired, nor is it anticipated at any time in the future."

The activities of OMISS are described in the Department's Annual Report for 1984, at 82, as follows:

> The Office of Management Information Systems and Support gathers information about the litigation workload and performance of U.S. Attorneys and their staffs, prepares statistical reports to improve the management of those offices, and provides the office automation products and services which make litigation activities more cost-effective.

Judge Murphy's affidavit also describes OMISS as having "essentially a record-keeping and computer systems management function." The Debt Collection Staff, of which Judge Murphy became Assistant Director, provides oversight and policy guidance to the Debt Collection Units in the United States Attorney's offices, and has no direct litigation control. Debt collection is, of course, purely a civil function. I must therefore disagree with the majority's intimation that Judge Murphy was seeking employment "in the *prosecutor's* executive office in the department prosecuting the [*Scott*] case." Majority op. at 750. (Emphasis added). He was negotiating with OMISS, not with the Justice Department's Criminal Division. His new job would have nothing to do with prosecuting wrongdoers.

Chief Judge Rogers compares Judge Murphy's situation to that of a judge who is seeking employment with a large law firm while presiding in a case which the firm is litigating. I do not find this to be

---

6. It is true that Scott is being prosecuted by the United States Attorney for the District of Columbia, and that OMISS is a part of the Executive Office for United States Attorneys. Since there are almost a hundred United States Attorney's offices, however, the italicized "s" is important and dissipates any supposed close link between the prosecutor before Judge Murphy and the prospective employer with whom the judge was negotiating.

an apt analogy.[7] Colossal as today's legal conglomerates may be, the Department of Justice is a horse of a different color. In 1984, that Department was comprised of twenty-seven different offices, bureaus, and divisions. There were ninety-four United States Attorney's offices, employing 2,350 Assistant United States Attorneys. These offices filed over 30,000 criminal cases. Monroe Scott's was one of them and, in the entire scheme of things, hardly a potential litmus test for deciding whether OMISS should employ Judge Murphy.

Given the foregoing, it is far from obvious to me that a reasonably well-informed and fair-minded person would believe that Judge Murphy's prospects of obtaining the OMISS job would in fact have been enhanced in any way if he sided with the prosecution against Mr. Scott. Moreover, it appears to me questionable, to say the least, whether a person possessing these attributes could reasonably apprehend that Judge Murphy would think that his job prospects would be improved if he tilted to the government, or that OMISS would evaluate his qualifications with such tilting or the lack thereof in mind. Judge Murphy was a judge in regular service for 18½ years and a senior judge for some time after that. His record was well known. He could not recast his image overnight. In the context of OMISS' purely non-litigative responsibilities and the tens of thousands of criminal cases handled by the Department of Justice, the incentive for Judge Murphy to take it out on Monroe Scott appears very remote indeed. Disqualification should not be based on tenuous speculation; the fear of partiality must be real enough and strong enough to warrant such a result. *In re United States,* 666 F.2d 690, 694–95 (1st Cir.1981).[8]

## III

The majority concludes that "this case falls at a point along the continuum of conduct reached by the Canon that requires a new trial in order to assure continued public confidence in the integrity of the judiciary." Majority op. at 756. I agree that there is such a continuum, but I would place negotiations with OMISS roughly in the middle of it, perhaps to the innocent side of center. If Judge Murphy had been negotiating for a position in the United States Attorney's office in the District of Columbia, or in the Criminal Division of the Department of Justice, then the appearance of partiality would have been substantially greater. If, on the other hand, he had been seeking employment at the Department of Agriculture or with the United States Information Agency, the appearance of partiality would have been less. This case, in my view, falls roughly at the same place on the continuum as would job negotiations with the Civil Division or Lands Division of the Department of Justice, which are also, in the broadest sense, a part of the same "team" as the Superior Court prosecutor. These Divisions, like EOUSA, cooperate with and sometimes supervise the United States Attorney's offices, but deal with entirely different subject matter and have only the remotest stake, if any, in the local criminal prosecutor's success.

The somewhat illusory character of Judge Murphy's perceived incentive to tilt against Scott can be assessed by comparing his situation to that of a judge who is under consideration for a promotion within the judiciary, or for an important position in the executive branch (*e.g.,* Director of

---

**7.** *Cf. United States v. Zagari,* 419 F.Supp. 494, 505 (N.D.Cal.1976), in which the court rejected as implausible or worse the contention that, since the United States Attorney's office is a "law firm," a judge must recuse himself in a criminal case because an Assistant United States Attorney represented him in connection with a motion to quash a subpoena.

**8.** The government contended in its brief to the *panel,* taking a position which it has since abandoned, that

the sheer unlikelihood that EOUSA, seeking an administrator for the Debt Collection Staff, would be aware of, much less care about, Judge Murphy's handling of appellant's individual case dispels any rational basis for questioning the judge's impartiality.

Although not pressed to the court *en banc,* this argument has considerable force.

the Federal Bureau of Investigation, Solicitor General, War Crimes Prosecutor, or United States Attorney). That judge may be considering criminal cases even though the President, who must decide who is to fill the post for which the judge aspires, has made it clear (as several Presidents have) that he is for "law and order," opposed to the "coddling of criminals," and against releasing defendants on "legal technicalities." A decision against the government in a publicized case—*e.g.*, the suppression of an alleged terrorist's confession—could well derail the judge's hopes.[9] The incentive to tilt in the government's favor is surely far greater in such a case than in the situation which confronted Judge Murphy here. The precedents strongly suggest, however, that recusal would not be required in the case of a judge under consideration for a new appointment. *See, e.g., Laxalt v. McClatchy*, 602 F.Supp. 214, 217–18 (D.Nev.1985), and authorities there cited.

In *Laxalt*, the court held that a United States Magistrate was not required to recuse herself in a case brought by Senator Laxalt although she had asked the Senator in the past to recommend her for a federal judgeship (over which appointment he had considerable authority) and might do so again. The court stated that

> this holding is not dependent on whether Magistrate Atkins plans again to apply for a judgeship in the future, does not plan ever to apply again, or doesn't know in her own mind whether she might seek a future judicial opening.

*Id.* at 218. Senator Laxalt's stake in the Magistrate's decision in private litigation in which he was the plaintiff was obviously far more direct than any interest OMISS might have in Judge Murphy's handling of suppression motions or other issues raised by Monroe Scott, of whom the OMISS officials had in all probability never heard. The incentive for the Magistrate to tilt to the Senator was necessarily greater than any corresponding incentive for Judge Murphy here.

The present case is distinguishable from *Laxalt* and from other decisions proclaiming that there is no appearance of impropriety when a judge presides over a case involving his former political supporters.[10]

---

**9.** Any stake that Judge Murphy might be thought to have in pleasing the government in the present case surely pales in comparison to that of an elected judge who is presiding over a trial in which community feelings run high at the very time that he is campaigning for reelection. This was the situation that confronted the judge in the famous Dr. Sam Sheppard murder case. In *Sheppard v. Maxwell*, 346 F.2d 707, 729–30 (6th Cir.1965), *rev'd on other grounds*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the court rejected, almost contemptuously, the contention that the judge's circumstances had prejudiced Dr. Sheppard's rights:

> Much has been made of the fact that the Sheppard trial began on the eve of a judicial election at which the trial judge and one of the prosecution staff were candidates. We must assume that this is emphasized to imply that desire for victory may have led the judge to conduct prejudicial to Dr. Sheppard's rights. We would have to entertain a low estimate of the integrity of our fellow judicial officers to join in any such inference....
>
> As realists we know that those who seek reelection to judicial office hope that their conduct will find public approval, but we do not think that judicial *misconduct* would be more attractive to the electorate than conduct marked by the integrity which we as judges

like to believe is possessed by elected judges as well as those who have the security of tenure during "good behavior." Nor are we prepared to presume that any judge is so far enamored of his position as to betray its responsibilities, no matter what he thinks would most please the electorate.

(Emphasis in original.) "Judges remain human even after assuming their judicial duties," *Green v. United States*, 356 U.S. 165, 198, 78 S.Ct. 632, 651, 2 L.Ed.2d 672 (1958) (Black, J., dissenting), and one might reasonably ask whether, in the foregoing passage, mere mortals are not viewed as sprouting angels' wings and as exercising superhuman ability to allow compelling considerations of self-interest to pass them by. *Compare* the excellent opinion of the Supreme Court of Florida in *State ex rel. La Russa v. Himes*, 144 Fla. 145, 147, 197 So. 762, 763 (1940), holding that a candidate for elective judicial office is disqualified from sitting in any case relating to issues or policies which he espoused during the campaign. But even if one disagrees with the *Sheppard* analysis, the holding that a judge may properly sit even in that case places in perspective the considerably more remote incentive at play here.

**10.** *See, e.g., Schultz v. Newsweek, Inc.*, 668 F.2d 911, 918–20 (6th Cir.1982) (trial judge nominated for appellate judgeship not required to recuse

Judge Murphy's negotiations with OMISS were proceeding while Scott's case was pending before him, and this contemporaneousness might reasonably be viewed as heightening the appearance of partiality. Nevertheless, I find the lack of any appreciable practical connection between OMISS and this criminal prosecution in the Superior Court to be a factor which tends to dissipate any appearance of impropriety.

## IV

In the affidavit which he filed in relation to his negotiations with EOUSA, Judge Murphy certified, under oath, that his discussions about the position at OMISS did not affect the performance of his judicial responsibilities. Scott's counsel stated in his brief that the "requisite evidentiary facts are contained in Judge Murphy's affidavit" and that "Appellant does not dispute these facts." It is thus undisputed that, for purposes of the issue before us *en banc*,[11] Judge Murphy was an impartial judge.

The cost of reversing a conviction solely for the sake of the appearance of justice is high. The direct consequences are formidable in themselves. *See, e.g., Helm v. United States*, 555 A.2d 465 (D.C.1989). It is not easy to reassemble witnesses many years after the fact. If they are found, their memories may have faded. If they are required to come to court several more times as a case is repeatedly postponed because of congested calendars—an event that occurs quite often in our crime-ridden capital—their enthusiasm for testifying (as well as their faith in the system) may wane as well. The addition of an old case to an overloaded docket requires the deferral of newer ones, in some of which presumptively innocent defendants may be in pretrial detention. If the prosecutor cannot put the pieces together again, a wrongdoer may go free for reasons unrelated to the merits, and more innocent victims may be harmed. Moreover, if the appearance of justice is critical, we should also consider how the fact of justice appears to the victims of the crime when the perpetrator is released, not because he is innocent or did not receive a fair trial, but because a concededly fair judge failed to avoid a deceptive appearance of prejudice.

The indirect consequences of reversal here may be even more severe. When this court decides a case *en banc*, lawyers look for opportunities to use the decision as precedent in situations which may not seem to us to resemble this one. Our defense bar includes ingenious attorneys who will not need my concurring opinion to conclude that, if there is an appearance of impropriety in the present case, then such an appearance may exist *a fortiori* in some of the kinds of situations discussed in Part III. Other convictions, too, will be attacked on grounds which have no relation to the merits or to actual judicial bias. There is a potential Pandora's box waiting to be opened.[12]

I do not suggest that this case is about to provide an ironic solution to our capital's problem of prison overcrowding. For one thing, I do not anticipate dramatic concessions by the prosecutor in every case. I also appreciate the profound societal value of the appearance of justice. Good things seldom come free, and we must be ready to

---

himself although publisher of defendant Detroit News had strongly supported her nomination); *cf. Warner v. Global Natural Resources PLC*, 545 F.Supp. 1298, 1300–02 (S.D.Ohio 1982); *Baker v. City of Detroit*, 458 F.Supp. 374, 375–77 (E.D. Mich.1978).

**11.** I do not address here, as the majority does not, those of Scott's contentions on appeal which are unrelated to Judge Murphy's negotiations with EOUSA.

**12.** Virtually every Superior Court judge who has been a member of the court for more than a year or two has a substantial number of criminal cases on his or her calendar, primarily probation revocations, even while assigned to a Division other than Criminal. If every judge who is under consideration for promotion to a higher judicial office or for selection to a position in the executive branch is disqualified from criminal cases, large numbers of such cases will have to be reassigned. There is, I think, broad agreement among judges that it is in the interest of justice for the judge who placed a defendant on probation to handle revocation proceedings, so that the offender must face the judge to whom he gave his promise to comply. Unnecessary reassignment of such cases would, in my view, be counter-rehabilitative.

pay a price for applying the standard of Caesar's wife. I summarize some of the obvious costs, however, because I find them to be very high indeed where, as here, the appearance of partiality seems to me so attenuated.

## V

I have some procedural concerns as well. This is a criminal appeal. The only parties are Scott and the United States. There is a third person, however, whose interests are formidably affected by the issue we hear *en banc*. He is Judge Murphy.

The government's concession that Judge Murphy violated the Canon is described by the majority as "commendable." That, too, depends on the eye of the beholder. The prosecutor's change of position has surely had a devastating effect on Judge Murphy's prospects for a ruling that he did not violate the Canon. Earlier in the case, the government was vigorously defending the judge's actions. As of the date of the *en banc* argument, however, the prosecution and the defense were both telling us that there was an ethical violation. Nobody is arguing to the contrary. In light of the evolution of the government's position, since Judge Murphy's compliance with ethical standards was being challenged, and since our decision could have collateral consequences for him, it might well have been appropriate for this court, despite traditional notions of standing, to take the rare step of inviting the judge to file a memorandum addressing the issue whether he violated the Canon. I concede that such a procedure would have been unusual, but this is not an ordinary case.

Alternatively, this court could remand the case to Judge Murphy for further findings. Indeed, there is authority suggesting that this is what ought to be done. In *In re Federal Skywalk Cases*, 680 F.2d 1175, 1183 (8th Cir.1982), the court said:

> 28 U.S.C. § 455(a) requires a judge to disqualify himself if a reasonable person would have factual grounds to doubt the impartiality of the court. *Blizard v. Frechette*, 601 F.2d 1217, 1220 (1st Cir.1979). The determination for the district judge to make is whether "his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Once that determination has been made, our role on review is limited to deciding whether the district court's evaluation of the claim of partiality or prejudice amounted to an abuse of discretion. *Blizard v. Frechette*, 601 F.2d at 1221.

Although I think the term "abuse of discretion" does not readily apply to the question whether Judge Murphy violated the Canon, there may be merit to a procedure under which the trial judge makes initial findings on the existence or non-existence of appearance of prejudice and the appellate court then addresses the issue under an appropriate standard of review.

In the present case, Judge Murphy filed a reasonably detailed affidavit which has provided much of the information which could be secured through a remand.[13] This is a criminal appeal, the resolution of which has long been delayed. Scott has served more than four years of a sentence of twelve to thirty-six years. If he has been improperly convicted, we should correct the injustice with dispatch. I therefore agree that we should not remand here, but express the hope that such a procedure will be considered in comparable cases in the future.[14]

## VI

When this case was presented to the panel, the government vigorously contended that there was no appearance of impro-

---

13. I note, however, that Judge Murphy's affidavit does not disclose whether the issue of appearance of partiality never occurred to him or whether he considered it and, for reasons which he could presumably articulate on remand, concluded that the appearance of justice had been preserved. There is a difference, for purposes of appellate review, between a considered decision and a failure to recognize that there was anything to decide.

14. Since Judge Murphy accepted the position at OMISS, he would not have been available for proceedings on remand at an earlier stage of this case.

priety. During oral argument before the court sitting *en banc*, however, government counsel conceded

1. that a reasonable person knowing the pertinent facts could have a reasonable doubt of the trial judge's impartiality; and

2. that, if the trial judge had disclosed the facts at the time of trial, he would have had a duty to recuse himself, and that if he had declined to do so, a writ of mandamus from this court would properly have issued.

The prosecutor argued that even though mandamus would have been appropriate before the trial, the situation changed once Scott had been convicted, and that we should now affirm the conviction despite what the government acknowledges to have been reasonable concerns about the appearance of impartiality.

Like the majority, I find this position untenable. If Scott was entitled to be tried before a judge other than Judge Murphy if he had asked for such relief pretrial, he surely cannot now be denied that right simply because Judge Murphy—wrongfully, the government effectively concedes—failed to disclose the pertinent facts to him in timely fashion and thus denied him the information necessary for the exercise of his right to seek recusal. Just as no man may take advantage of his own wrong, *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 232–33, 79 S.Ct. 760, 761–62, 3 L.Ed.2d 770 (1959), so the government should not be permitted to profit from an error which it now says Judge Murphy made at Scott's expense. With its concession that mandamus would have been appropriate before trial, the government in my view effectively conceded the case.

We are thus faced with a criminal appeal in which the government has admitted trial court error, and in which all members of the court agree that reversal is required if such error in fact occurred. Although, for the reasons described in this opinion, I have serious reservations as to whether an impartial observer fully informed of the facts would perceive any appearance of impropriety, it is difficult to vote to sustain a conviction where the prosecutor now says that the appearance of justice was flawed. Under the adversary system, judges may ignore or reject concessions of this kind, but they should pause and reflect carefully before they do so.

My own assessment of the facts tempts me to adopt a position more "extreme," relatively speaking,[15] than that taken by either of the litigants. The timing of the negotiations, however, does raise a question. Moreover, the United States Attorney's office and OMISS are both within the Department of Justice. The prosecutor in the *Scott* case, or his boss, could conceivably be asked to comment on Judge Murphy's candidacy. I find the connection between the job and the criminal case tenuous, but I cannot say that it does not exist. At least in retrospect—and the advantages of hindsight are inordinate—I agree that it would have been better for Judge Murphy to err on the side of caution and to make disclosure.

In a case that is even reasonably close, a judge will ordinarily honor a litigant's concession. On balance, I think I should do so here. Accordingly, with very little enthusiasm, but with sincere respect for the views of my colleagues in the majority,[16] I concur in the judgment of the court.

---

15. In principle, the position that Judge Murphy did not violate the Canon is not, in my view, extreme at all.

16. Although my analysis differs from theirs, the very fact that my colleagues discern an appearance of partiality supports the conclusion that reasonable people might do so.